# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

**JACQUELYN B. FRANK,**

    Plaintiff,

v.

**BOARD OF TRUSTEES OF EASTERN ILLINOIS UNIVERSITY, BLAIR LORD,** individually, **JEANNE LORD,** individually, and **LINDA SIMPSON,** individually,

    Defendants.

No.

## COMPLAINT

Plaintiff, Jacquelyn B. Frank ("Plaintiff" or "Professor Frank"), by her attorneys, Richard R. Harden and Justin N. Brunner of Thomas, Mamer & Haughey, LLP and Thomas D. Rosenwein of the Rosenwein Law Group, for her Complaint against the Board of Trustees of Eastern Illinois University ("EIU"), Blair Lord ("B. Lord" or "Provost"), Jeanne Lord ("J. Lord" or "Associate Dean") and Linda Simpson ("Simpson" or "Chair") (collectively "Defendants"), states as follows.

## INTRODUCTION

1. This is an action for violation of Title I of the American with Disabilities Act, 42 U.S.C. §12101, *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §701, *et seq.*, for discrimination based on perceived disability. Professor Frank also asserts claims under Illinois law for breach of contract, defamation, false light invasion of privacy and tortious interference with contract.

## PARTIES

2. Professor Frank is a tenured Associate Professor at EIU in the School of Family

and Consumer Sciences. Professor Frank was hired and began working at EIU in August 2009. She served as an Assistant Professor at EIU until May 2013 and was promoted to Associate Professor, with tenure, beginning fall term 2013. She also served as Gerontology/Aging Studies Coordinator from the time of her hire in August 2009 until August 2015.

3. Professor Frank received her B.A (*Magna Cum Laude)* from Washington University in 1988, and her Ph.D. from Northwestern University in 1994. She previously was a tenured Associate Professor in the Department of Sociology and Anthropology at Illinois State University from 1998 to 2005, and a tenured Associate Professor of Gerontology and Anthropology at the University of Indianapolis, Center for Aging and Community from 2005 to 2009, before joining EIU.

4. Professor Frank is a noted expert in the area of gerontology. Her areas of study include aging in place, residents' perspectives, the concept of "home," Alzheimer's disease, intergenerational service-learning, and aging prisoners. Professor Frank also has been researching Alzheimer's disease for many years (both the experience of those with the disease and the challenges facing family caregivers) as well as studying aging in prisons.

5. Her published works include: Kruger, T.M., Gilland, S., Frank, J., *et al*. (2016) "Cross-Cultural Comparison of Long-Term Care in the U.S. and Finland: Research Done through a Short-Term Study Abroad Experience," in *Gerontology & Geriatrics Education*; Gill, E., Frank, J. (2015) "The Negotiated Identities of Long-Term Inmates: Breaking the Chains of Problematic Integration," in *Western Journal of Communication*, Vol. 79, 513-532; Frank, J., Omstead, J-A, Pigg, S. (2012) "The Missing Link: Service-Learning as an Essential Tool for Correctional Education," in *Journal of Correctional Education*; Frank, J. (2010) "Anticipatory and Disenfranchised Grief Among Dementia Family Caregivers: Helping Spouse and Adult

Child Caregivers to Cope," in Hughes, J., Lloyd-Williams, M., & Sachs, G., *Supportive Care for the Person with Dementia*, Oxford University Press; Frank, J. (2009) "Alzheimer's and Relationships," in H. Ries & S. Sprecher, (eds), *Encyclopedia of Human Relationships*, (pp. 88-90), Thousand Oaks: Sage Publications; Frank, J. (2008) "Evidence for Grief as the Major Barrier Faced by Alzheimer Caregivers: A Qualitative Analysis," in *American Journal of Alzheimer's Disease & Other Dementias*, 22(6), 241-253; Frank, J. (2005) "Semiotic Use of the Word 'Home' Among People with Alzheimer's Disease: A Plea for Selfhood?" in G. D. Rowles & H. Chaudhury (Eds.), *Home and Identity in Late Life*, International Perspectives (pp. 171-196) New York, NY, Springer Publishing; Frank, J. (2006) "Caring for Aging Parents: Family Relationships, Medical Care, and the Search for a Dignified End to Life" [Review essay of the books: My Mother's Hip: Lessons from the World of Eldercare and Bugs in her Tea: An Adventure in Caregiving], *Journal of Health Politics, Policy and Law*, (31)1, 219-228; and Frank, J. (2001) "How Long Can I Stay?: The Dilemma of Aging in Place in Assisted Living," in *Journal of Housing for the Elderly* (15), 5-30 (also co-published as a book titled, *Assisted Living: Sobering Realities*, Haworth Press, 2001). In 2002 Professor Frank published a book titled, *The Paradox of Aging in Place in Assisted Living* (Greenwood Press), which focused on the residents' experiences living in two assisted living settings in the Chicagoland area.

6.  Professor Frank has made numerous conference presentations, including most recently at the 6th National Conference on Higher Education in Prison (2016), "Our Education is not Wasted: Long-term Prisoners' Application of Their Liberal Arts Education;" the 8th International Prisoner's Family Conference (2016), "Rebuilding Parent-Child Relationships for Teenagers Incarcerated as Adults;" the 2015 Aging in America Conference (2015) (with C. LeGrand) "The Impact of the Money Smart for Older Adults Program on Perceptions of

3

Financial Exploitation;" the 66th Gerontological Society of America annual conference (2013), "Old-Age Transitions and Life Trajectories: A Phenomenological Study of Aging among Long-term Inmates;" 59th American Society on Aging, Aging in America Conference (2013), "A Day in the Life: Immersive Learning as Professional Development for Gerontology Graduate Students;" and the 10th International Association for Research on Service-Learning and Community Engagement international conference (2010), "Collaborating with Inmates to Design a Service-Learning Program for Prisoners: Development of the S.L.I.C.E. Model: Participatory Action Research with 2 Indiana Prisoners."

7. Professor Frank is a member of several professional organizations, including the Association for Anthropology and Gerontology, American Correctional Association, American Association for Family and Consumer Sciences, American Society on Aging, Gerontological Society of America, Association for Gerontology in Higher Education and the International Association for Research on Service-Learning and Community Engagement.

8. Defendant Board of Trustees is the governing body of EIU with the authority and responsibility to operate, manage, control and maintain the University in accordance with 110 ILCS 665/10-1, *et seq*.

9. B. Lord is provost and vice president for academic affairs at EIU, who recently received a vote of "no confidence" from a majority of the EIU faculty. He is married to J. Lord.

10. J. Lord is an associate dean at EIU and married to B. Lord.

11. Simpson is a Professor in the School of Family and Consumer Science at EIU and former chair of that School.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Professor Frank's claims pursuant to 28 U.S.C. §§1331 and 1367(a). The Central District of Illinois has personal jurisdiction over Defendants because they engaged in discrimination prohibited by federal law as well as the breach of contract and torts of defamation, false light and intentional interference, all in this District.

13. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiff is a citizen and resident of this District, EIU's principal place of business is in this District, and a substantial part of the events giving rise to this claim occurred in this District.

14. Professor Frank has satisfied the administrative requirements for her ADA claims, timely filed an EEOC charge asserting discrimination based on disability (No. 440-2016-02717) on April 4, 2016, and received a Notice of Right to Sue from the EEOC on March 14, 2017 ("right to sue letter") (Exhibit A). This Complaint is timely filed within 90 days of Professor Frank's receipt of the Notice of Right to Sue.

## FACTS COMMON TO ALL COUNTS

15. One of the areas of Professor Frank's pioneering research is in the area of aging in prison populations. Professor Frank not only researches and publishes in this area but also teaches courses on the topic, including a course in which students visit a prison and interview prisoners (course titled "Incarceration and the Family").

16. In addition, Professor Frank has functioned as the Coordinator of the EIU Gerontology/Aging Studies Program ("Program") beginning with her hire in August 2009. As such, she received consistently high evaluations of her work. Part of the work of the Program is to administer comprehensive examinations, which a student must pass to obtain a Masters degree. Such tests are prepared, evaluated and graded by a committee of professors in the Program.

17. The comprehensive examinations are administered in March and October of successive academic years. Any student who initially fails the March comprehensive examination is allowed to re-take the examination in October.

18. One of the graduate students in the Program, who was a returning adult student, failed the comprehensive examinations twice, in March and October 2014. After learning of the results of her second failed examination, that student met with Simpson, in her capacity as Chair, in April 2015. The student blamed her examination failures on Professor Frank. The student alleged that Professor Frank failed her (even though the exam is graded by a committee, not a single professor) because the student resisted Professor Frank's purported attempts to force her to have a prison boyfriend when the student was in the course that included supervised visits to a prison.

19. Simpson never met with Professor Frank with regard to this allegation, nor did she contact the other members of the comprehensive examination committee who assessed and graded the student's examination. Instead, Simpson initiated her own private "investigation" of Professor Frank for "illegal activities," including questioning Professor Frank's colleagues about their knowledge of her "illegal activities." That "investigation" resulted in no finding or suggestion of "illegal activities" on Professor Frank's part.

20. Despite the lack of grounds for the failing student's allegations, Simpson asked the EIU campus police to further investigate Professor Frank. No one from the campus police interviewed or contacted Professor Frank. Nonetheless, the campus police concluded that there was no evidence of any illegal activity by Professor Frank. Professor Frank was not made aware of this campus police investigation until it was revealed to her months later.

21. Simpson's inquiries to others in the School regarding Professor Frank's "illegal activities," and statements that the EIU campus police was in the process of conducting a "criminal investigation" of Professor Frank, led one of the professors in the School to decide that she would not allow graduate students to complete an independent study course with Professor Frank due to the concern with "possible illegal activities" by Professor Frank.

22. On July 1, 2015, without notice to Professor Frank, Simpson telephoned the prison where Professor Frank was engaged in research (Wabash Valley Correctional Facility), to inform the prison that EIU would no longer endorse any of her research there or any of her volunteering. Upon information and belief, the Provost, as the highest academic officer at the University, authorized Simpson's directive to the prison. That directive resulted in the loss of Professor Frank's ongoing research into aging among prison populations at that facility.

23. Neither B. Lord nor Simpson had authority to make such a pronouncement. The only body at EIU with authority to make decisions on endorsing or allowing Professor Frank's research is the EIU Institutional Review Board ("IRB"), which reviews and decides upon research involving human subjects. Neither Simpson nor any other administrator contacted the IRB with regard to investigating Professor Frank's aging prison population research. And neither the IRB nor EIU has any authority regarding Professor Frank's volunteering activities, which are activities undertaken as a private citizen.[1]

24. In addition, on August 6, 2015, Simpson, on J. Lord's advice, unilaterally removed Professor Frank as Graduate Coordinator of the Gerontology/Aging Studies Program without consultation with Professor Frank, purporting to fault Professor Frank for her work by relying on an unofficial memorandum from five years earlier that had been superseded by five

---

[1] The prison subsequently terminated Professor Frank from volunteering at that facility for fraternizing with inmates but did not disqualify her from conducting research.

years of superior level official reviews. Holding a Coordinator position provided Professor Frank with an additional month of salary (approximately $6,500) beyond the regular nine-month salary paid to full-time faculty members.

25. Also in August 2015, Simpson unilaterally reassigned the graduate assistant whose work had been crucial to Professor Frank's research projects, including an externally funded research project, thereby effectively preventing Professor Frank from completing her research. Simpson never informed Professor Frank of the reassignment of her graduate assistant; it was left to the graduate student to have to inform Professor Frank of her removal.

26. Simpson, as authorized by J. Lord, additionally removed Professor Frank from all Master's degree thesis committees upon which she was serving, including those committees that Professor Frank was chairing, as well as from all comprehensive examination committees. Professor Frank only later learned of her removal from these committees from the students themselves; neither Simpson nor the newly appointed Coordinator ever informed Professor Frank of these changes. Simpson also removed Professor Frank from all departmental committees.

27. On September 8, 2015, B. Lord authored and sent to Professor Frank a letter that sought to impose a sanction of a three-month suspension, with concomitant loss of pay, and barred Professor Frank from having any contact with students, based in large part on the alleged possibility of "criminal proceedings" being filed against Professor Frank that in fact were never brought.

28. These actions coordinated by B. Lord, J. Lord and Simpson - the statement to the prison withdrawing EIU's endorsement for research; the cancellation of Professor Frank's Coordinator position; the reassignment of her graduate assistant; the removal of Professor Frank

8

from the thesis, comprehensive examination and departmental committees; the removal of Professor Frank from all teaching; the forbidding of contact with EIU students; the false disclosure of Professor Frank's alleged "illegal activities" to others; and the threatened imposition of salary suspension - were all contrary to the contract that governs the employment of faculty at EIU, including its published policies and Collective Bargaining Agreement ("CBA") that are made known to faculty and upon which they rely.

29. Pursuant to the CBA between EIU and the faculty, Professor Frank timely appealed the proposed sanctions and demanded the hearing required under the CBA, which had the effect of blocking the threatened three-month suspension until the matter could be resolved by the CBA process.

30. The day after Professor Frank's appeal was filed, Simpson, at the behest of B. Lord and J. Lord, retaliated by contacting the dean of the Lumpkin College of Business and Applied Sciences to falsely report that Professor Frank was suicidal and threatening to kill herself.

31. As a result, Charleston police and paramedics came to Professor Frank's home unannounced and roused her at 10:00 p.m. to thwart her alleged plan to kill herself. After talking with Professor Frank, the police and paramedics left, having witnessed and assessed Professor Frank as without risk.

32. Nonetheless, B. Lord, in collaboration with J. Lord and Simpson, refused to reinstate Professor Frank to her teaching and academic duties and instead forced her to take a mandatory medical leave on the pretext that Professor Frank was suffering from suicidal depression and a threat to herself.

33. J. Lord harassed and threatened a colleague of Professor Frank in an effort to force that faculty member to denounce Professor Frank and support the false claim that Professor Frank was suffering from suicidal depression. That faculty member refused to falsely testify that Professor Frank told her she was planning to commit suicide, and has been harassed for her refusal to lie by Defendants thereafter.

34. Simpson then forced a vote in the Department that stripped Professor Frank of all departmental assignments. Upon information and belief, Simpson was acting with the encouragement and/or direction of J. Lord in doing so.

35. Even though Professor Frank underwent an ordered psychiatric evaluation by a psychiatrist chosen by EIU, who found Professor Frank not to be in need of a forced medical leave and fit for her work with no restrictions, B. Lord and J. Lord refused to allow Professor Frank to return to teaching, a further violation of the contract between faculty, including Professor Frank, and EIU, and a further violation of her right to academic freedom.

36. Instead, J. Lord reassigned Professor Frank's duties from teaching to serving at the direction of the Dean. J. Lord forbade Professor Frank from using her own campus office, instead directing her to work in the Dean's suite of offices, under J. Lord's supervision.

37. Despite these actions against her, stemming from the invented perception of Professor Frank as suffering from suicidal depression, Professor Frank was trusting that she would be able to resume her career and teaching for the spring semester. She was listed on the EIU computer system as teaching two courses, and students had registered for both courses.

38. However, on December 7, 2015, Professor Frank discovered that she had been removed from both of her Spring 2016 courses without notice, only learning of these changes by reviewing the course listings online. No explanation for her removal from teaching the courses

was ever provided, which removal was caused by B. Lord, J. Lord and Simpson.

39. Thereafter, Professor Frank took an FMLA leave from EIU for the Spring semester of 2016 to deal with the post-traumatic stress stemming from the arbitrary, capricious, harassing and hostile treatment she received at the hands of Defendants, as set forth above. She subsequently learned that she was not assigned to teach any courses for the Fall semester of 2016, the only tenured professor to be so treated.

40. Professor Frank then took a professional development leave for the 2016-2017 academic year, which she used to successfully obtain a further master's degree at the University of Illinois College of Law.

41. Professor Frank is scheduled to return to EIU in the Fall semester of 2017. She was listed on the Fall 2017 course schedule to teach three courses, which is the normal teaching load for a full-time faculty member. However, she discovered in February 2017 that she was listed to teach only one course, a change initiated by B. Lord and J. Lord without knowledge of Professor Frank's new Department chair. Only by protesting this change to her new Department chair was Professor Frank able to obtain her full teaching load.

## COUNT I
## DISABILITY DISCRIMINATION – ADA

42. Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 42 of this Count I as if fully restated herein.

43. Section 12112(a) of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. 12112(a).

44. EIU violated §12112(a) of the ADA by discriminating against Professor Frank,

stereotyping and harassing her based on its perception of disability, creating a hostile work environment, and unlawfully acting to suspend her employment and remove her as Coordinator, on account of perceived disability, *i.e.*, her alleged suicidal depression.

45. In so doing, EIU has damaged Professor Frank's career and reputation, stigmatizing her with her students, academic peers and the larger professional community.

## COUNT II
## DISABILITY DISCRIMINATION – REHABILITATION ACT

46. Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 46 of this Count II as if fully stated herein.

47. Section 504 of the Rehabilitation Act states (in part): "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

48. EIU receives federal financial assistance in the form of student loans, grants and other federal support for its programs and activities.

49. EIU violated §504 of the Rehabilitation Act by discriminating against Professor Frank, stereotyping and harassing her, creating a hostile work environment, and unlawfully suspending her employment, on account of perceived disability, *i.e.*, her alleged suicidal depression.

50. In so doing, EIU has damaged Professor Frank's career and reputation, stigmatizing her with students, academic peers and the larger professional community.

## COUNT III
## BREACH OF CONTRACT

51.     Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 51 of this Count III as if fully restated herein.

52.     EIU breached its contract with Professor Frank by allowing B. Lord, J. Lord and Simpson to unilaterally remove her as Coordinator, reassign her graduate assistant without notice, remove her from student and faculty committees, remove her from teaching, violate her academic freedom, violate her right to confidentiality, refuse to allow her to use her office, cancel her courses, and impose a forced medical leave upon her.

53.     These actions constituted violations of: CBA Article 6.10, which forbids assignments that are "arbitrary or capricious;" CBA Articles 16.2 and 21.1 which forbid allowing or fostering an unprofessional environment in which faculty members are subject to abuse and unfair treatment; CBA Article 6.2.g., which requires confidentiality of the sanctions process without disclosure to others; CBA Article 6.8, which recognizes the "essential" aspect of academic freedom that is the faculty right to interact with students and other faculty; EIU's Internal Governing Policy ("IGP") No. 37, which indicates that in the absence of restrictions in a health care provider's notice, EIU cannot arbitrarily refuse to allow a faculty member to return to previously assigned duties; IGP No. 58, which provides a process for dealing with accusations of scientific misconduct; IGP No. 177, which further requires confidentiality of investigations into "dishonest conduct;" IRB policies when issues of scientific misconduct are alleged; and EIU Ethics Act Guide implementing the State Officials and Employees Ethic Act (5 ILCS 430/5-10), which *inter alia* provides for notice and prohibits retaliation.

54.     As a result of such actions in violation of her contractual rights, Professor Frank has suffered damages, including loss of income, lost opportunities to advance her career through

13

ongoing research and reputational injury.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

55. Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 55 of this Count IV as if fully restated herein.

56. Defendants B. Lord, J. Lord and Simpson were not privileged to induce the breaches of contract alleged above. They interfered with Professor Frank's contract with EIU in the hopes of forcing her to resign from EIU and reassigning her courses to less qualified instructors, to the detriment to EIU and its students.

57. Defendants B. Lord, J. Lord and Simpson acted with malice toward Professor Frank, contrary to EIU's interests, and in excess of their authority.

58. Professor Frank has been injured by Defendants B. Lord, J. Lord and Simpson's intentional interference with her contract in that their actions have forced a curtailment of her research into aging in prisons, have deprived her of compensation for her coordinator position and have falsely suggested to others that she has been engaged in criminal activity, thereby causing reputational harm and emotional distress in addition to economic loss.

## COUNT V
## DEFAMATION PER SE

59. Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 59 of this Count V as if fully restated herein.

60. A statement is defamatory *per se* under Illinois law if it falls into one or more of five categories: (i) it imputes the commission of a criminal offense; (ii) it imputes infection with a communicable disease; (iii) it imputes an inability to perform or want of integrity in the discharge of duties of office or employment; (iv) it prejudices a party or imputes lack of ability

in the party's trade, profession, or business; or (v) it imputes adultery or fornication.

61.     A statement that is defamatory *per se* is presumed to have caused damage, because the subject matter is so obviously and materially harmful that injury to reputation may be presumed; in such cases, a plaintiff need not plead or prove actual damages.

62.     Defendants B. Lord, J. Lord and Simpson defamed Professor Frank when they advised others, including members of her own department, that Professor Frank was the subject of a "criminal investigation," had engaged in "illegal activities" and was planning to kill herself. Defendants B. Lord, J. Lord and Simpson continue to publish such statements to Professor Frank's detriment.

63.     Defendants B. Lord, J. Lord and Simpson's statements clearly denote that Professor Frank is unable to perform her duties as a professor, impute to her the commission of crimes, as well as a want of integrity in the discharge of duties of office or employment.

64.     Neither Defendant B. Lord, J. Lord nor Simpson had any privilege to publish these statements and have clearly lowered Professor Frank in the eyes of the community or served to deter third parties from associating with her. B. Lord, J. Lord and Simpson were aware that their defamatory statements were untrue yet persisted in publishing the statements, including placing the written sanctions letter in Professor Frank's personnel records file which falsely states that Professor Frank is subject to "criminal proceedings," which letter currently remains in her personnel records file for others to read.

65.     Defendants B. Lord, J. Lord and Simpson were aware that these statements were false, and were made with full knowledge of their falsity and with reckless disregard for the consequences to Professor Frank. Defendants made such statements for the express purpose of injuring her.

## COUNT VI
## FALSE LIGHT INVASION OF PRIVACY

66. Plaintiff restates and incorporates by reference paragraphs 1-41 as paragraph 66 of this Count VI as if fully restated herein.

67. False light invasion of privacy under Illinois law is found when the false light in which the plaintiff was placed would be highly offensive to a reasonable person and the defendant knew or acted with reckless disregard of the false light in which plaintiff would be placed.

68. Defendants B. Lord, J. Lord and Simpson placed Professor Frank in a false light when they (i) advised the prison that Professor Frank's research was no longer endorsed by EIU; (ii) advised others, including members of Professor Frank's Department, that she was under "criminal investigation;" (iii) suddenly removed Professor Frank from her classes, student and department committees; (iv) forbade her from using her campus office, and instead required her to be on campus to perform make-work under close supervision in the Dean's office; and (v) advised others that Professor Frank was suffering from suicidal depression and planning to kill herself.

69. Defendants B. Lord, J. Lord and Simpson acted with reckless disregard in falsely placing Professor Frank before members of the public, including her colleagues and students, in a manner that is highly offensive to a reasonable person.

70. In so doing Defendants B. Lord, J. Lord and Simpson intended and caused Professor Frank emotional distress, including causing her to experience PTSD, and necessitating an FMLA leave to recover.

**WHEREFORE,** Professor Frank prays that this Honorable Court grant the following relief:

**I.    Against Defendant Board of Trustees for Eastern Illinois University**

A. An Order declaring that Defendant EIU violated the ADA, and/or Rehabilitation Act and the contract;

B. An Order enjoining future violations by Defendant EIU;

C. Reinstatement to Plaintiff's position as a Coordinator, including all benefits that Professor Frank would have had but for Defendant EIU's illegal conduct;

D. Payment of all lost, past and future wages and benefits (including any and all types of compensation and benefits, back pay, and front pay);

E. Compensatory, emotional and mental distress damages; reputational, punitive or exemplary damages; statutory and liquidated damages; and civil penalties;

F. Payment of all recoverable portions of Professor Frank's attorneys' fees and costs of litigation (including statutory fees and expert witness fees);

G. Pre-and post-judgment interest; and

H. All other relief, whether legal or equitable, that this Court may deem appropriate.

**II.    Against Defendants Blair Lord, Jeanne Lord and Linda Simpson**

A. An Order declaring entry of judgment in favor of Professor Frank and against Defendants B. Lord, J. Lord and Simpson for interference with contract, defamation, and false light invasion of privacy in an amount to be determined at trial to compensate her for her injuries, currently believed to be in excess of $1,000,000;

B. Entry of judgment in favor of Professor Frank for punitive damages in an amount to be determined at trial, currently believed to be in excess $2,000,000;

C. An Order requiring B. Lord, J. Lord and Simpson to pay all recoverable portions of Professor Frank's attorneys' fees, costs and expenses; and

    D.    Grant such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues raised in the foregoing Complaint for which a jury trial is available as a matter of right, and she respectfully requests a jury trial on all other issues.

                                        **JACQUELYN B. FRANK,**

Dated: June 12, 2017                          By: *s/ Justin N. Brunner*
                                                                        One of Her Attorneys

Richard R. Harden (#6185447)
Justin N. Brunner (#6323496)
Thomas, Mamer & Haughey, LLP
30 East Main Street, Suite 500
P.O. Box 560
Champaign, Illinois 61824-0560
T: (217) 351-1500
F: (217) 351-2169
E-Mail: riharden@tmh-law.com
E-Mail: justin@tmh-law.com

Thomas D. Rosenwein (#2391597) – *LEAD COUNSEL per CDIL-LR 11.2*
Rosenwein Law Group
120 South LaSalle Street, Suite 1440
Chicago, Illinois 60603
T: (312) 346-1080
E-Mail: trosenwein@rlawgrp.com